**UNITED STATES of America, Appellant,**

v.

**Frank ALTESE, a/k/a Frankie Feets, et al., Appellees.**

No. 902, Docket 76–1008.

United States Court of Appeals, Second Circuit.

Argued April 15, 1976.

Decided July 1, 1976.

Certiorari Denied Jan. 10, 1977.

See 97 S.Ct. 736.

David G. Trager, U. S. Atty., E. D. N. Y., David Margolis, Fred F. Barlow, Sp. Attys., Brooklyn, N. Y.; Shirley Baccus-Lobel, Robert H. Plaxico, Attys., Dept. of Justice, Wash., D. C., for appellant.

Maurice Brill, New York City, for appellee Salvatore Annarumo.

Wild & Goldstein, New York City, for appellee Napoli.

---

Richard I. Rosenkranz, Brooklyn, N. Y., for appellee Jerry D'Avanzo.

Gustave H. Newman, New York City, for appellee Sabato Vigorito.

Before CLARK,* Associate Justice, Ret., and TIMBERS and VAN GRAAFEILAND, Circuit Judges.

## PER CURIAM:

This is an appeal pursuant to 18 U.S.C. § 3731 from an order of the District Court dismissing, prior to trial, counts one and two of an eight count indictment alleging gambling and racketeering offenses in violation of the Organized Crime Control Act of 1970, 84 Stat. 922. The indictment charged twenty two defendants in the various counts, with count one charging sixteen of them with being associated with an enterprise engaged in interstate commerce and conducting its affairs through a pattern of racketeering activity and through

the collection of debts in violation of 18 U.S.C. § 1962(c);[1] all twenty two of the defendants were charged in count two with having conspired to violate Section 1962(c), in violation of 18 U.S.C. § 1962(d).[2] The remaining counts, none of which are involved here, charged the conduct of an illegal gambling business in violation of 18 U.S.C. § 1955, and § 1952, obstruction of justice by two defendants in violation of 18 U.S.C. § 1510 and conspiracy to violate Sections 1955 and 1952. The counts under § 1952 and § 1510, being counts six and seven, were dismissed without objection of the government for failure to allege essential elements of the offenses.

The gravamen of the two counts before us (counts one and two) is that the named defendants had conducted a large scale gambling business through a pattern of racketeering activity and the collection of unlawful debts, as defined in 18 U.S.C. § 1961(1), (5) and (6).[3]

---

* Associate Justice, Retired, Supreme Court of the United States, sitting by designation.

1. 18 U.S.C. 1962 provides:
   (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

2. 18 U.S.C. 1962:
   (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

3. Section 1961 provides:
   (1) "Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code; Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of

gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1511 (relating to the obstruction of State or local law enforcement), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;
   (5) "pattern or racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any pe-

The appellees claimed and the District Court held that Section 1962(c) applied only to a legitimate enterprise that was conducted through a pattern of racketeering activity or the collection of unlawful debts and not to an illegal gambling business. In so holding the district court held that Title IX of the Organized Crime Control Act, of which Section 1962(c) is a part, "deals with the problem of infiltration of legitimate business by persons connected with organized crime" and was not designed by Congress "to cover the types of activity charged in (counts one and two) of this indictment." We disagree and reverse.

## 1. The Language of the Act:

We first note that each of the four paragraphs of Section 1962 begins with the all inclusive phrase: "It shall be unlawful for any person . . . " who has received *any* income derived from *any* pattern of racketeering activity, etc., to use *any* part of such income in the acquisition of *"any* enterprise engaged in . . . interstate or foreign commerce." (emphasis supplied). The word "any" is explicit. In addition, we note that in Section 1961 the Congress in defining the words "person" and "enterprise" again uses the word *"any"*. In the light of the continued repetition of the word "any" we cannot say that "a reading of the statute" evinces a Congressional intent to eliminate illegitimate businesses from the orbit of the Act. On the contrary we find ourselves obliged to say that Title IX in its entirety says in clear, precise and unambiguous language—the use of the word "any"[4]—that all enterprises that are conducted through a pattern of racketeering activity or collection of unlawful debts fall within the interdiction of the Act. Congress could, if it intended any other meaning, have inserted a single word of restriction. Instead it left out the word and inserted a clause providing that the provisions of Title IX "be liberally construed to effectuate its remedial purposes." 84 Stat. 947. We cannot—in the light of such language—hold that Congress did not say what it meant nor meant what it said.

## 2. The Cases on Title IX:

If the language of Title IX is not found to be so explicit as we hold it to be and we are obliged to construe the language of Title IX, we come out with the same result. As this Circuit held in *United States v. Parness,* 503 F.2d 430, 439 fn. 12 (1974)[5] *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1974), we are obliged to construe the Act liberally. Indeed, Congress declared in the Act itself:

> It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime. 84 Stat. 923.

These new penal prohibitions, enhanced sanctions, and new remedies clearly extend to an illegitimate business as well as a legitimate one; to read the Act otherwise does not make sense since it leaves a loop-

---

riod of imprisonment) after the commission of a prior act of racketeering activity;

(6) "unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law,

where the usurious rate is at least twice the enforceable rate; . . .

4. "Any" is defined in Webster's New International Dictionary, Second Edition, as follows: "Indicating a person, thing, etc., as one selected without restriction or limitation of choice, with the implication that everyone is open to selection without exception; all, taken distributively; every; used especially in assertions with emphasis on unlimited scope."

5. It was held that the word "enterprise" in the Act included both foreign and domestic.

hole for illegitimate business to escape its coverage.

We note that three other Circuits have reached this same result.[6] *United States v. Cappetto,* 502 F.2d 1351 (7th Cir. 1974) *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Campanale,* 518 F.2d 352 (9th Cir. 1975), *cert. denied,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638, 44 U.S.L.W. 3397 (1976), *United States v. Hawes,* 529 F.2d 472 (5th Cir. 1976), and *United States v. Morris,* 532 F.2d 436 (5th Cir. 1976). We are pleased to make it a foursome.

Reversed and remanded.

VAN GRAAFEILAND, Circuit Judge (dissenting):

Because I believe that the majority's holding radically extends federal jurisdiction to virtually every criminal venture affecting interstate commerce, I must dissent. Although such a large scale incursion by the federal government into matters traditionally of local concern may be constitutionally permissible, I do not believe that such a step should be taken in the absence of clear Congressional direction. With all due respect to my brothers, I am unable to find such a mandate in either the statutory language or the legislative history of Title IX of the Organized Crime Control Act of 1970, 84 Stat. 922, 941–948.

The majority places great reliance on the word "any" which precedes "enterprise" in 18 U.S.C. § 1962. The significance of this word escapes me. "Enterprise" is defined in 18 U.S.C. § 1961(4). If, in fact, that definition encompasses only legitimate business or organizations, placing the word "any" before the defined phrase in § 1962 should not expand its meaning.

Section 1961(4), necessarily at the core of the controversy before us, yet curiously omitted from the majority's opinion, defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." While the concluding language of this definition is subject to an expansive interpretation, the well established doctrine of *ejusdem generis* warns against expansively interpreting broad language which immediately follows narrow and specific terms. *United States v. Insco,* 496 F.2d 204, 206 (5th Cir. 1974). To the contrary, this maxim counsels courts to construe the broad in light of the narrow. *United States v. Baranski,* 484 F.2d 556, 566 (7th Cir. 1973). Viewed in this manner, and keeping in mind the traditional rule resolving ambiguities in penal statutes in favor of lenity, *United States v. Campos-Serrano,* 404 U.S. 293, 297, 92 S.Ct. 471, 30 L.Ed.2d 457 (1971); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *United States v. Archer,* 486 F.2d 670, 680 (2d Cir. 1973),[1] the scope of § 1962 on its face, is, at best, uncertain.

Even were I to agree with the majority's facial reading of the statute, I would, nevertheless, feel duty bound to examine the legislative history to ascertain Congressional intent. In expounding a statute, we must not be guided by a single sentence or word therein. Rather, we must look to the provisions of the whole law so that we may give effect to the legislative will. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers."

---

**6.** Two district courts have held to the contrary: *United States v. Amato,* 367 F.Supp. 547 (S.D.N.Y.1973) and *United States v. Moeller,* 402 F.Supp. 49 (D.Conn.1975) while *United States v. Costellano,* 75 Cr. 51 (E.D.N.Y.1975) upheld the Act's coverage as to both illegal and legitimate enterprises.

**1.** Notwithstanding the mandate of Congress to liberally construe the provisions of Title IX, 84

Stat. 947, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

*Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892). *Muniz v. Hoffman*, 422 U.S. 454, 469, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975).

A review of the legislative history of Title IX leaves no doubt that Congress never contemplated that "enterprise" as used in §§ 1961, 1962 would extend beyond legitimate businesses or organizations. *See* S.Rep. No. 91–617, 91st Cong., 1st Sess. (1969); H.R.Rep. No. 91–1549, 1970 U.S. Code Cong. & Admin.News, pp. 4007, 4032–4036; Comment, *Organized Crime and the Infiltration of Legitimate Business: Civil Remedies for "Criminal Activity"*, 124 U.Pa.L.Rev. 124, 204–206 (1975). There is nothing in the floor debates that would indicate that any member of Congress expected or desired the far reaching interpretation of Title IX postulated by the majority herein. 116 Cong.Rec. 585–586, 35,193–35,319 (1970); *United States v. Moeller*, 402 F.Supp. 49, 58 n.8 (D.Conn.1975); *United States v. Frumento*, 405 F.Supp. 23, 29–30 (E.D.Pa.1975); *United States v. Mandel*, 415 F.Supp. 997, 19 Cr.L. 2032 (D.Md.1976). Perhaps the most convincing indications of Congressional intent are contained in a lengthy and scholarly response to Title IX's critics by Senator John L. McClellan, the bill's principal sponsor. McClellan, *The Orgainzed Crime Act (S. 30) or its Critics: Which Threatens Civil Liberties?*, 46 Notre Dame Lawyer 55, 140–146, 196–197 (1970). From his opening observation that "Title IX is aimed at removing organized crime from our legitimate organizations", *id.* at 141, to his conclusion that § 1961 *et seq.* offers the first major hope of eradicating the "organized criminal influence in legitimate commerce," *id.* at 146, Senator McClellan clearly recognizes the scope of his bill as limited to "racketeering infiltration of legitimate business", *id.* at 196.

While the majority's disregard of legislative intent is troublesome, it pales in the shadow of the prospective consequences of their action on sensitive federal-state relationships and limited federal police resources and the resultant transformation of relatively minor state offenses into federal felonies by mere geographic happenstance. *Rewis v. United States, supra*, 401 U.S. at 812, 91 S.Ct. 1056.

The end result of the majority's expansive interpretation of § 1962(c) is to accord the word "enterprise", intended by Congress to be synonymous with commercial business, parity with the term "conspiracy". Hereafter, the Government will justifiably feel free to utilize § 1962(c) to prosecute any unlawful venture engaging in, or the activities of which affect, interstate commerce where the participants therein committed any two acts of "racketeering activity". *United States v. Moeller, supra*, 402 F.Supp. at 59. The Government suggests that its prosecutorial efforts will be kept in check by the statute's requirements of (1) a "pattern of racketeering activity", and (2) an effect on interstate commerce. I cannot agree. Only two acts of racketeering activity are required to establish a "pattern". 18 U.S.C. § 1961(5). Moreover, § 1961(1)'s definition of racketeering activity is as broad as it is long, encompassing any murder, kidnapping, gambling, arson, robbery, bribery, extortion or narcotics transaction chargeable under any State law and punishable thereunder by more than one year's imprisonment, as well as the violation of any of a series of enumerated federal criminal statutes. The interstate commerce requirement of § 1962 is likewise unlikely to greatly confine the scope of federal law enforcement efforts. In criminal statutes containing similar requirements, a de minimis involvement with, or effect on, commerce has frequently been found sufficient. *See, e. g., United States v. Crowley*, 504 F.2d 992, 997–998 (7th Cir. 1974) [Hobbs Act, 18 U.S.C. § 1951]; *United States v. Kahn*, 472 F.2d 272, 285–286 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973) [Travel Act, 18 U.S.C. § 1952].[2]

2. Our Court, however, has in recent decisions sought to stem the tide. *See United States v. Merolla*, 523 F.2d 51, 54–55 (2d Cir. 1975);

*United States v. Archer*, 486 F.2d 670, 678–683 (2d Cir. 1973).

There has been increasingly widespread concern of late about the intrusion of federal criminal law into areas traditionally within the sole purview of the states. *United States v. Archer, supra.* Where Congress has spearheaded the invasion, the Courts are quite naturally bound to follow as footsoldiers. When the legislature halts its forward progress, albeit perhaps only temporarily, it is not for the judiciary to lead the charge. Yet, this is precisely what I fear we have done herein.

Appellees are alleged to have engaged in illegal gambling, concededly a racketeering activity. In so doing, they have not invested in, acquired control of, or employed the resources of any legitimate commercial concern. The "enterprise" the majority finds is the gambling operation itself, a de facto conspiracy whose sole *raison d'être* was the carrying on of criminal conduct. While Congress has recognized the desirability of federal prosecution of illegal gambling, previously a matter solely of State concern, by the passage of Title VIII of the Organized Crime Control Act of 1970, 84 Stat. 922, 936–940, 18 U.S.C. § 1955, it has placed strict limits on those gambling operations which warrant federal intervention. Thus, § 1955 comes into play only when the gambling business involves five or more persons and remains in substantially continuous operation for more than thirty days or grosses $2,000 in a single day. In adopting these limitations, Congress intended to confine federal criminal jurisdiction to "relatively large gambling operations". *See* McClellan, *Organized Crime Control Act, supra,* at 138. The interpretation of § 1962 adopted by my brothers effectively circumvents the criteria of Title VIII. Because racketeering activity under § 1961 includes any gambling chargeable under any State law and punish-

able by more than one year's imprisonment,[3] all that need be proved in addition to the State violation is an effect on interstate commerce. The 5 man, 30 day, $2,000 requirements are therefore no longer of significance, and "mom and pop" bookmaking operations, the prosecution of which was intended by Congress to be left solely to the states by the design of Title VIII, McClellan, *The Organized Crime Control Act, supra,* at 138, is instead transformed into a federal offense under Title IX.

Although the instant indictment alleges a violation of federal law [18 U.S.C. § 1955] as the racketeering activity, the ramifications of the majority's expansive interpretation of § 1962 become even more pronounced where the racketeering activity charged is a violation of State law. In *United States v. Moeller, supra,* for example, defendants were indicted for their role in the burning of a Shelton, Connecticut rubber plant, arson being a crime punishable by imprisonment of more than one year under Connecticut law. Utilizing the majority's reasoning, the Government defined the "enterprise" as a group of individuals associated in fact for the purpose of burning down the Shelton plant. 402 F.Supp. at 57. Arguing that § 1962(c) was designed solely to eliminate the infiltration of "legitimate" businesses, defendants moved to dismiss the indictment. The District Court agreed, and no appeal was taken from its decision. As I understand footnote 6 of the majority's opinion, *Moeller* (at least so far as it defined "enterprise") is no longer good law in this Circuit.

Application of the Court's holding today to the facts in *Moeller* illustrates the far-reaching effect of our expansive interpretation of "enterprise". Without a clear and

---

**3.** Additional problems are raised by the vast disparities among the laws of the various states. Under New York law, for example, the following are gambling offenses punishable by more than one year imprisonment: (a) receiving more than $500 in a single day in connection with a lottery or policy scheme [N.Y. Penal Law § 225.10(2)(b)], and (b) possession of gambling records reflecting more than five hundred chances in a lottery or policy scheme

[N.Y. Penal Law § 225.20(2)]. Under Vermont law gambling offenses punishable by more than one year's imprisonment include: (a) bookmaking, second offense [13 Vt.Stat.Ann. §§ 2151(1), 2052], and (b) the stimulating or depressing of race horses by the administration of drugs [13 Vt.Stat.Ann. § 2153]. In Connecticut almost no gambling offenses are subject to penalties greater than one year [Conn.Gen.Stat. Ann. §§ 53–278b, c, d, e, f].

precise direction from Congress, we have created a statute making it a federal felony for any group, association or conspiracy to violate any state's murder, kidnapping, gambling, arson, robbery, bribery, extortion or narcotics statutes in any manner which utilizes or affects interstate commerce. The disruptive effect of our holding on federal-state relationships and on the limited enforcement and judicial resources of the federal government is every bit as great as that of the expansive interpretation of the Travel Act, 18 U.S.C. § 1952, condemned by the Supreme Court in *Rewis v. United States, supra. See also United States v. Archer, supra.*

Although the question at bar has been resolved on several occasions by the district courts of this Circuit, with varying results,[4] it is a matter of first impression in this Court. Accordingly, the majority turns for guidance to decisions of the Fifth, Seventh and Ninth Circuits. With all due respect to my brothers, I believe that their reliance is misplaced.

In *United States v. Campanale,* 518 F.2d 352, 364 (9th Cir. 1975), *cert. denied,* 44 U.S.L.W. 3397 (Jan. 13, 1976), the Ninth Circuit held only that § 1962 applied to "business enterprises", however small. There was not the slightest hint that the business involved, Pronto Loading and Unloading Company, was not a legitimate commercial concern. Neither was there any language to suggest that the Ninth Circuit would have upheld the conviction regardless of the legitimacy of the enterprise.

In *United States v. Cappetto,* 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), the Seventh Circuit held that § 1962 applied to gambling enterprises, legitimate or not. Quite aside from the fact that *Cappetto* was a civil, not criminal, action and, therefore, did not bring into play the

canon of lenity concerning the ambit of ambiguous criminal statutes, *Rewis v. United States,* supra, 401 U.S. at 812, 91 S.Ct. 1056. *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955), I believe that the opinion therein is unable to withstand careful scrutiny. Appellants in *Cappetto* contended, as is argued herein, that Congress' purpose in enacting § 1962 was to protect "legitimate business" against infiltration and not to prohibit racketeering itself. The Seventh Circuit rejected this argument, concluding that "both the statutory language and the legislative history . . . support the government's contrary interpretation of the Act." 502 F.2d at 1358. While conceding that one of Congress' targets was "the infiltration of legitimate organizations by organized crime", Sen.Rep. 91–617, *supra,* p. 80 (1969), and that § 1962(a) was aimed at that target, the Court went on to conclude that Congress also intended to prohibit "any pattern of racketeering activity in or affecting commerce" and that §§ 1962(b) and (c) were aimed at that target.[5] In support of this argument, *Cappetto's* sole authority was our Circuit's decision in *United States v. Parness,* 503 F.2d 430 (2d Cir. 1974) *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), a case that held simply that the term "enterprise" encompassed foreign as well as domestic corporations. To bolster its contention that Congress intended to include illegal gambling businesses within the definition of "enterprise", the *Cappetto* court turned to the Senate Committee Report on the Organized Crime Control Act. In so doing, however, it inadvertently relied on language relating to § 1955 (the gambling statute). The quoted language was clearly never intended to be applied to §§ 1961 or 1962. *United States v. Moeller, supra,* 402 F.Supp. at 60; Comment, *Infiltration of Legitimate Business, supra,* at 202–203.

---

4. See footnote 6 of the majority's opinion.

5. I find it somewhat difficult to comprehend how subsections (b) and (c) can conjure up a different meaning of "enterprise" than subsection (a) since both are derived from the identi-

cal definition contained in § 1961(4). *See* Comment, *Organized Crime and the Infiltration of Legitimate Business: Civil Remedies for "Criminal Activity",* 124 U.Pa.L.Rev. 192, 201–202 (1975).

The most recent pronouncements on the scope of § 1962 come from the Fifth Circuit. *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976); *United States v. Morris,* 532 F.2d 436, 441–442 (5th Cir. 1976). *Hawes* unquestionably follows *Cappetto* in holding that enterprise means more than legitimate businesses. It is worth noting, nevertheless, that the enterprise at issue in *Hawes,* Peach State Distributing Co., was engaged in the legitimate manufacture, sale, repair and leasing of jukeboxes and penny arcade amusements in addition to its illegal gambling operations. 529 F.2d at 476. Clearly, therefore, it fell within the ambit of those activities that Congress was trying to combat, to wit, the utilization of a legitimate business as a front for racketeering activity. In *Morris,* however, the Fifth Circuit went further and applied its expansive reading of enterprise to encompass an informal group of card players "associated in fact" for the sole purpose of participating in rigged card games designed to defraud unsuspecting visitors to Nevada. 532 F.2d at 442. Concededly, therefore, the Fifth Circuit now regards § 1962 as prohibiting racketeering activity *per se* so long as the requisite effect on commerce can be found. I am confident that Congress never intended such a result.

For all of the preceding reasons, I would decline to fall in line behind the Fifth and Seventh Circuits [6] and would affirm Chief Judge Mishler's dismissal of counts one and two of the indictment.

---

6. As previously indicated, I do not believe that the Ninth Circuit has to date expressed its views on the matter at issue.